[No. 14946-0-II.   Division Two.   October 13, 1993.]

LAWRENCE E. FISHER, ET AL, *Appellants,* v. PARKVIEW
PROPERTIES, INC., ET AL, *Respondents.*

*Bradley B. Jones* and *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim,* for appellants.

*George S. Kelley,* for respondents.

MORGAN, J. — "Normandy on the Heights" is a residential subdivision situated on a cliff in Gig Harbor. It looks out over the Tacoma Narrows Bridge, Point Defiance, Vashon Island, Mt. Rainier and the Cascade Mountains.

The lots in Normandy are subject to protective covenants. These covenants allow fences and other improvements that do not unreasonably or significantly interfere with another owner's view.

Article 5 of the covenants establishes a three-member architectural control committee. It states, "[N]o improvement or alteration of a previously approved improvement

shall be commenced until complete plans and specifications for the same have been submitted and approved in writing by the Committee."[1] It also states, "The Committee shall hold meetings at its own convenience, as determined by the Chairman. . . . [T]he Committee is not required to notify interested parties of each pending proposal, but shall make available and respond to inquiries about the same."[2]

The original members of the architectural control committee were the Normandy developers, Steve Lewis, Roy Ovist, and Richard Kelley. They were also its members during the events giving rise to this case.

In 1989, Dr. Lawrence Fisher owned and lived in a house built on lot 7 of Normandy. To enjoy the view to the northeast, he had to look across lot 6.

In 1989, Lewis and Ovist owned lot 6. However, they had contracted to build a house on it, and to sell both the lot and the house to Dr. Jerry Markussen for a price of $315,000. The sale was to close on August 25, but in no event later than August 31.

The contract between Lewis, Ovist and Markussen called for Lewis and Ovist to construct a fence around lot 6 prior to closing. Acting in their capacity as members of the architectural control committee, Lewis and Ovist examined various types of fences and decided that a 4-foot high, wrought-iron fence would be suitable.

Construction of the fence began shortly before August 25. Fisher immediately objected that the fence would interfere with his view. Lewis thought the sale to Markussen could be finalized without completion of the fence, so he stopped construction.

Markussen arrived at Normandy on August 25 and noted the missing fence. After explaining that Fisher had objected to the proposed fence, Lewis suggested that Markussen call Fisher and discuss Fisher's concerns. When Markussen did that, Fisher asserted that the fence would have an adverse

---

[1] Exhibit 11, at 12-13.

[2] Exhibit 11, at 16.

effect on his view and property value, and he threatened to obtain an injunction to stop further construction of the fence.

That same day, several meetings were held among various people involved in the sale. The outcome was that Markussen told Lewis he no longer wished to purchase lot 6. Lewis then told Fisher the sale had collapsed.

Apparently after further consideration, Lewis and Ovist decided that they wanted to compel Markussen to specifically perform the sale of lot 6. They believed they could do this only if they completed construction of the fence by August 31. They informed Fisher of their intent to complete the fence, and he objected.

On August 29, Fisher filed a complaint for damages and a temporary restraining order. In an accompanying affidavit, he incorrectly swore:

> I am a member of the "Architectural Control Committee", which is specifically to review and approve any fence, wall or hedge prior to its erection. No such request for review and approval has been brought to the committee, nor has my participation as a voting member in a decision by the committee been sought.[3]

He attached to the affidavit sections 6.9 through 6.13 of Normandy's protective covenants, which vest the architectural control committee with authority to determine when a proposed fence "unreasonably or significantly interfere[s] with or obstruct[s]" a view, but he omitted to attach article 5, describing the membership and procedures of the architectural control committee.

Later on August 29, Fisher presented his complaint and affidavit to a court commissioner, who issued a temporary restraining order prohibiting construction of the fence. The commissioner set a $1,000 injunction bond and scheduled a show cause hearing for September 11. Obeying the restraining order, Lewis and Ovist did not construct the fence.

At the show cause hearing on September 11, the commissioner enjoined, pending trial, any further construction of a fence on lot 6. Lewis and Ovist asked the commissioner to

---

[3] Clerk's Papers (CP), at 9.

raise the injunction bond to $75,000, but after hearing argument, he raised the bond only to $10,000.

Also on September 11, Lewis and Ovist counterclaimed against Fisher for damages. They alleged that Fisher had wrongfully obtained the restraining order and preliminary injunction, and that Fisher had tortiously interfered in their contractual relationship with Markussen.

In April 1990, Lewis and Ovist sold the house on lot 6 to another buyer. The house and lot were sold without a fence, and for $24,400 more than Markussen had agreed to pay.

In December 1990, a bench trial was held on Lewis and Ovist's counterclaims for wrongful issuance of a restraining order and tortious interference with a contractual relationship. Fisher's original claim was moot because lot 6 had been sold without a fence.

The trial court awarded damages of $10,000 on the wrongful issuance claim. In its oral decision, it stated:

> I find that the architectural control committee found that the fence as proposed did not unreasonably or significantly interfere with or obstruct [Fisher's] views.
>
> . . . .
>
> The [Fishers] do not have the right to prevent the construction of a fence. Their rights as set forth in the covenants were to ensure that the architectural control committee approved the fence prior to its construction, and that in fact was done. The actions of the architectural control committee were reasonable in light of the circumstances and taken in good faith.
> I find the architectural control committee properly followed the covenants in authorizing the construction and placement of the wrought iron fence.
> The [Fishers] did not have a legal right to prevent the installation of the wrought iron fence, as the architectural control committee did in fact follow the requirements as set forth in the [covenants].[4]

In its written findings and conclusions, the court also stated:

> Had the Court Commissioner on August 29, 1989 had all the relevant facts which have been presented as part of this trial, the Temporary Restraining Order would not have issued. Therefore, the issuance of said Temporary Restraining Order was wrongful.[5]

---

[4] Report of Proceedings (RP) (Jan. 4, 1990), at 5-6.

[5] Conclusion of law 4; CP, at 372-73.

Also in its written findings and conclusions, the court stated that because the temporary restraining order had prevented Lewis and Ovist from completing the fence on lot 6, it had proximately caused them to lose their sale of lot 6 to Markussen. That loss caused an 8-month delay in selling lot 6, and during that 8 months, Lewis and Ovist had paid $3,000 per month in construction loan interest that would not have accrued but for loss of the sale to Markussen. Also, Lewis and Ovist had had to make certain changes in the home to improve its marketability,[6] and they had been hampered in obtaining construction loans on other lots because of the unpaid construction loan on lot 6. The court ultimately ruled, "[I]t is clear that defendants were damaged in an amount in excess of the $10,000 bond ordered by this court",[7] but "[d]efendant's recovery for wrongful issuance of a restraining order is limited to the amount of the bond [$10,000] . . .."[8]

Although the court awarded damages on the wrongful issuance claim, it rejected the tortious interference claim. It found, "Steve Lewis was advised and knew on August 25 that Markussens no longer wished to purchase the home and Steve Lewis so advised Dr. Fisher on that same day."[9] It further found, "At the time the restraining order was obtained Dr. Fisher believed that the Lewis-Markussen contract had failed."[10] It concluded, "Because Dr. Fisher believed that the Markussen-Lewis contract had failed he cannot be held responsible for having interfered tortiously with that contract."[11]

---

[6]Apparently, Lewis and Ovist had customized the home for Markussen, and they thought its custom features would detrimentally affect sale on the open market.

[7]Finding of fact 33; CP, at 371.

[8]Conclusion of law 7; CP, at 373.

[9]Finding of fact 28; CP, at 369.

[10]Finding of fact 30; CP, at 370.

[11]Conclusion of law 6; CP, at 373.

Fisher appeals, and Lewis and Ovist cross-appeal. We discuss the wrongful issuance claim first, and the tortious interference claim second.

I

The parties raise four issues involving the wrongful issuance claim. (A) Did the trial court err when it determined that the temporary restraining order and preliminary injunction were wrongfully issued? (B) Did the trial court err when it determined that the temporary restraining order and preliminary injunction were a proximate cause of damage to Ovist and Lewis? (C) Did the trial court err when it limited Ovist's and Lewis's recovery to the face amount of the injunction bond? And (D) did the trial court err when it set the amount of the injunction bond at only $10,000?

A

A temporary restraining order is an order entered without notice, or after informal notice. CR 65(b). It operates for a period not to exceed 14 days unless extended for good cause. CR 65(b). In contrast, a preliminary injunction is an order entered after formal notice to the opposing party. CR 65(a). It operates from issuance until trial. *See* CR 65(a). Here, the commissioner entered a temporary restraining order on August 29 and a preliminary injunction on September 11.

Not surprisingly, the elements of a wrongful issuance claim include (1) that the order or injunction was issued, and (2) that it was issued wrongfully. *Blakiston v. Osgood Panel & Veneer Co.*, 173 Wash. 435, 437, 23 P.2d 397 (1933); *Tacoma v. Sperry & Hutchinson Co.*, 82 Wash. 393, 395, 144 P. 544 (1914); *Swiss Baco Skyline Logging Co. v. Haliewicz*, 14 Wn. App. 343, 346, 541 P.2d 1014 (1975); *Johnsa v. Edwards*, 582 So. 2d 1280, 1283 (La. 1991). Neither a temporary restraining order nor a preliminary injunction is proper in a doubtful case. *Tyler Pipe Indus., Inc. v. Department of Rev.*, 96 Wn.2d 785, 793, 638 P.2d 1213 (1982) (quoting *Isthmian S.S. Co. v. National Marine Eng'rs Beneficial Ass'n*, 41 Wn.2d 106, 117, 247 P.2d 549 (1952) (preliminary injunction)); *see* CR 65(b) (temporary restraining order). A

preliminary injunction is proper only when a clear legal or equitable right is shown. *Tyler Pipe Indus., Inc. v. Department of Rev.*, 96 Wn.2d at 792-93 (quoting *Port of Seattle v. International Longshoremen's & Warehousemen's Union*, 52 Wn.2d 317, 319, 324 P.2d 1099 (1958)); *Brown v. Voss*, 105 Wn.2d 366, 372-73, 715 P.2d 514 (1986); *see also* RCW 7.40-.020. A temporary restraining order is proper only when there is a clear showing, based on specific facts, that the applicant will suffer irreparable injury, loss, or damage before an adversary hearing can be convened in open court.[12] CR 65(b)(1). A temporary restraining order or injunction is issued wrongfully when it "would not have been ordered had the court been presented all of the facts." *Knappett v. Locke*, 19 Wn. App. 586, 592, 576 P.2d 1327 (1978), *aff'd*, 92 Wn.2d 643, 600 P.2d 1257 (1979).

When Fisher sought and obtained the order and injunction in this case, he provided covenants showing that the architectural control committee was authorized to approve fences, but omitted covenants showing the membership and procedures of the committee. He also swore he was a member of the architectural control committee, and that "no . . . request for review and approval [of the disputed fence] has been brought to the committee, nor has my participation as a voting member in the committee been sought."[13]

The trial court found that this information was wrong. The trial court also found that if the commissioner had known the true facts, he would not have issued the temporary restraining order or the preliminary injunction.

Fisher has not assigned error to the trial court's findings, so each finding is a verity on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992); *Levine v. Jefferson Cy.*, 116 Wn.2d 575, 581, 807 P.2d 363 (1991). In any event, substantial evidence supports each

---

[12]Both the temporary restraining order and the preliminary injunction are subject to additional requirements not stated in the text, but we have no occasion to explore those here.

[13]CP, at 9.

finding, and the court's findings support its conclusions. *See American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d 217, 222, 797 P.2d 477 (1990); *Ellenburg v. Larson Fruit Co.*, 66 Wn. App. 246, 250, 835 P.2d 225, *review denied*, 120 Wn.2d 1011 (1992). The trial court did not err when it ruled that Fisher had caused the temporary restraining order and preliminary injunction to be issued wrongfully.

## B

The elements of a claim for wrongful issuance also include proximate cause and damage. *Stone v. Hunter Tract Imp. Co.*, 68 Wash. 28, 30, 122 P. 270 (1912); *Johnsa v. Edwards*, 582 So. 2d at 1283; *see Blakiston v. Osgood Panel & Veneer Co.*, 173 Wash. at 438; *Tacoma v. Sperry & Hutchinson Co.*, 82 Wash. at 395. Proximate cause means a cause which, in a direct sequence unbroken by any new independent cause, produces the injury complained of, and without which such injury would not have happened. *See Alger v. Mukilteo*, 107 Wn.2d 541, 545, 730 P.2d 1333 (1987); *Hartley v. State*, 103 Wn.2d 768, 777-78, 698 P.2d 77 (1985); WPI 15.01.

Here, the trial court found that wrongful issuance proximately caused damage to Lewis and Ovist in excess of $10,000. Essentially, it found that wrongful issuance prevented Lewis and Ovist from completing the fence, and that noncompletion of the fence was the reason they could not consummate the sale of lot 6 to Markussen. Lot 6 was not resold until the following April, and during the 8-month delay, Lewis and Ovist had to pay $3,000 per month in construction loan interest on lot 6. They also had to make certain changes in the home to increase its marketability, and the unpaid construction loan on lot 6 hampered their ability to obtain construction loans on other lots.

The trial court did not err when it made these rulings. As before, Fisher does not assign error to any of the findings, so each finding is a verity on appeal. *Cowiche Canyon Conservancy v. Bosley, supra; Levine v. Jefferson Cy., supra.* Moreover, substantial evidence supports each finding, and the findings support the conclusions. *See American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d at 222;

*Ellenburg v. Larson Fruit Co., supra.* The elements of proximate cause and damage were properly established.[14]

## C

The trial court found that Lewis and Ovist sustained damages in excess of $10,000 as a proximate result of the wrongful issuance of the temporary restraining order and preliminary injunction. However, the court limited Lewis's and Ovist's recovery to the amount of Fisher's injunction bond, $10,000. Lewis and Ovist assign error to this limitation.

Generally, common law liability in tort does not result from suing out an injunction, unless the claimant proves the elements of malicious prosecution. *Venegas v. United Farm Workers Union*, 15 Wn. App. 858, 863, 552 P.2d 210 (1976) (quoting *Yonkers v. Federal Sugar Ref. Co.*, 221 N.Y. 206, 208-09, 116 N.E. 998 (1917) (Cardozo, J.)), *review denied*, 88 Wn.2d 1002 (1977); 42 Am. Jur. 2d *Injunctions* § 359, at 1171-72 (1969); Annot., *Recovery of Damages Resulting From Wrongful Issuance of Injunction as Limited to Amount of Bond*, 30 A.L.R.4th 273 (1984); *see Gem Trading Co. v. Cudahy Corp.*, 92 Wn.2d 956, 962-63, 603 P.2d 828 (1979) (listing elements of malicious prosecution of civil case); *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 497, 125 P.2d 681 (1942) (same); *cf. Hanson v. Snohomish*, 121 Wn.2d 552, 558, 852 P.2d 295 (1993) (listing elements of malicious prosecution of criminal case); RCW 4.24.350. The underlying philosophy "is that an error in granting an injunction is an error of the court, for which there is no recovery in damages unless it is sufficiently intentional to be the basis for a suit for malicious prosecution." 42 Am. Jur. 2d at 1172; *see also* 30 A.L.R.4th at 275.

---

[14]Fisher also argues that because Lewis and Ovist could have pursued an anticipatory repudiation claim against Markussen prior to August 31, 1989, issuance of the temporary restraining order could not have proximately caused damages to Lewis and Ovist. This argument fails. Fisher has not shown that Lewis or Ovist had a duty to pursue such a claim. Assuming that Lewis and Ovist had such a duty, Fisher has not shown why he should benefit from their failure to perform it. If the argument is somehow related to mitigation of damages, the record does not show, by a preponderance of evidence or otherwise, that a claim against Markussen would have met with success.

In some jurisdictions, including Washington, the effects of this rule have been mitigated by statute or court rule. Annot., 30 A.L.R.4th at 275-76. Thus, CR 65(c) provides, subject to certain exceptions not pertinent here:

> [N]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The effect of a statute or court rule such as CR 65(c) is to allow recovery for wrongfully suing out a temporary restraining order or preliminary injunction even though there is no proof of malicious prosecution. According to the Washington and majority rule, however, the amount of such recovery "is limited to the face amount of the bond plus interest from the date that the action is brought." *Jensen v. Torr*, 44 Wn. App. 207, 211, 721 P.2d 992, *review denied*, 107 Wn.2d 1004 (1986); *see also Tacoma v. Sperry & Hutchinson Co.*, 82 Wash. 393, 397, 144 P. 544 (1914); *Venegas v. United Farm Workers Union*, 15 Wn. App. at 863 (quoting *Yonkers v. Federal Sugar Ref. Co.*, 221 N.Y. at 208-09); Annot., *Recovery of Damages Resulting From Wrongful Issuance of Injunction as Limited to Amount of Bond*, 30 A.L.R.4th 273 (1984). The underlying public policy "is to encourage ready access to courts for good faith claims." *Jensen v. Torr*, 44 Wn. App. at 211. As the court more fully explained in *Tracy v. Capozzi*, 98 Nev. 120, 124-25, 642 P.2d 591, 594-95 (1982):

> Th[e] minority view holds that when the bond proves inadequate, the complainant is the logical party to respond to damages because he caused the injury by initiating the restraint.
> The majority rule, however, limits recovery to the amount of the bond, absent a showing that the complainant obtained the temporary restraining order or preliminary injunction maliciously or in bad faith. A similar position is adopted by the federal courts.
> The minority view . . . undeniably has common sense appeal[, for] it insures an adequate award of damages resulting from wrongful restraint assessed against the one who made the mistake, albeit in good faith. However, we find the majority view more compatible with public policy encouraging ready access to

our courts. On balance, we find this public policy principle out-weighs our concern for defendants facing inadequate bonds at the termination of a wrongful restraint. We must zealously pro-tect the good faith pursuit of legal and equitable remedies from the deterrent certain to be posed by unknown liability for mis-take.

... [T]he defendant is not without recourse in the event the bond proves to be inadequate during the restraint and continu-ing litigation; he may move for an increase in the bond. ...

(Citations omitted.)

Here, Lewis's and Ovist's wrongful issuance claim was for recovery on Fisher's injunction bond. They neither pleaded nor proved malicious prosecution. Regardless of the amount of their damages, they were not entitled to recover more than the amount of the bond, and the trial court correctly so ruled.

### D

■ Lewis and Ovist contend that even if their claim is limited by the face amount of the bond, the court commis-sioner erred in setting the bond at only $10,000.[15] The amount of an injunction bond is within the trial court's discretion. *Jensen*, 44 Wn. App. at 211. On August 29, the court commis-sioner set the bond at $1,000. On September 11, Lewis and Ovist asked that it be raised to $75,000, but the commissioner increased it to $10,000. This ruling was within the commis-sioner's discretion.

### II

■ Lewis and Ovist claim the trial court erred when it ruled that they had not proved the essential elements of tor-tious interference. Those elements are:

1. The existence of a valid contractual relationship or business expectancy;
2. That defendants had knowledge of that relationship;
3. An intentional interference inducing or causing a breach or termination of the relationship or expectancy;

---

[15]It will be noted that this contention is directed at a pretrial ruling of the court commissioner, as opposed to a trial ruling of the superior court judge who tried the wrongful issuance claim. We do not consider whether review of a ruling setting the amount of an injunction bond must be sought at the time the ruling is made.

4. That defendants interfered for an improper purpose or used improper means; and
5. Resultant damages.

*Commodore v. University Mechanical Contractors, Inc.*, 120 Wn.2d 120, 137, 839 P.2d 314 (1992) (quoting *Sintra, Inc. v. Seattle*, 119 Wn.2d 1, 28, 829 P.2d 765, *cert. denied*, 121 L. Ed. 2d 598 (1992)).

The second element is the one in issue here. According to the trial court's findings, Lewis told Fisher on August 25 that the sale involving Markussen had collapsed. Thus, when Fisher applied for the temporary restraining order on August 29, he had no knowledge of a present contractual relationship between Lewis, Ovist and Markussen, and the second element of tortious interference claim was not proved.[16]

The trial court did not err when it made these rulings. Lewis and Ovist do not assign error to any of the trial court's findings, so each finding is a verity on appeal. *Cowiche Canyon Conservancy v. Bosley, supra; Levine v. Jefferson Cy., supra.* Moreover, substantial evidence supports each finding, and the trial court's findings support its conclusions. *See American Nursery Prods., Inc. v. Indian Wells Orchards*, 115 Wn.2d at 222; *Ellenburg v. Larson Fruit Co.*, 66 Wn. App. at 250. The second element of tortious interference was not adequately proved.

Affirmed.

ALEXANDER, C.J., and PETRICH, J. Pro Tem., concur.

After modification, further reconsideration denied November 22, 1993.

---

[16]We reject Lewis's and Ovist's contention that finding 29 required the trial court to find that Fisher knew of a presently existing contract with Markussen when Fisher applied for the restraining order on August 29. The trial court found that on August 25, Fisher had been told that the sale with Markussen was off, and it was entitled to infer from this finding that Fisher lacked knowledge of a presently existing contract when he applied for the restraining order.